IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

BOBBY JO SPOOR PARK,     )    Case No. 1:17-cv-01727
                     )
     Plaintiff,        )
                     )    MAGISTRATE JUDGE
     v.               )    THOMAS M. PARKER
                     )
COMMISSIONER OF SOCIAL    )
SECURITY,          )    **MEMORANDUM OF OPINION**
                     )    **AND ORDER**
     Defendant.     )

## I.    Introduction

Plaintiff, Bobbie Jo Spoor Park,[1] seeks judicial review, pursuant to 42 U.S.C. §405(g), 42 U.S.C. §1383(c)(3), of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). The parties have consented to my jurisdiction. ECF Doc. 16.

Because the Commissioner's failure to address the work ability reports of Spoor Park's treating physician, Dr. Mahna, was non-harmless legal error, the final decision of the Commissioner must be VACATED and the matter must be REMANDED. However, the Commissioner's determination that Spoor Park's depression was not a severe medical impairment in the Step Two analysis was supported by substantial evidence, providing no basis for remand.

---

[1] In the administrative transcript, plaintiff is referred to by various names, including Bobbie J. Spoor Park, Bobbie Spoor Park, Bobbie Spoor, Bobby Spoor, and Bobby Jo Spoor-Park. I will refer to the plaintiff as Bobbie Jo Spoor Park, because that is how the she refers to herself in the complaint (ECF Doc. 1).

## II.     Procedural History

An administrate law judge denied Plaintiff, Bobbie Jo Spoor Park's application for disability insurance benefits ("DIB") for the period from September 20, 2004 through the date last insured, December 31, 2009, under Title II of the Social Security Act.  (Tr. 21)  The ALJ found that Spoor Park was not disabled because she could perform a significant number of jobs in the economy despite her impairments.  (*Id.*)  Spoor Park's DIB claim was denied initially on October 7, 2013 (Tr. 126) and upon reconsideration on December 12, 2013.  (Tr. 130)  On June 15, 2015, Spoor Park appeared and testified at an administrative hearing.  (Tr. 77-89)  On February 23, 2016, Spoor Park appeared and testified at a supplemental hearing.  (Tr. 28-76).

The Appeals Council denied Spoor Park's request for review on June 20, 2017, leaving the ALJ's decision as the final decision of the Social Security Commissioner.  20 C.F.R. § 416.1481; Tr. 1-4.  Spoor Park now raises two arguments: (1) appropriate weight was not given to the treating source physician's opinions; and (2) the ALJ erred by failing to include depression as a severe medically determinable impairment.  *See* ECF Doc. 14, Page ID# 1099, 1102.

## III.    Evidence

### A.     Relevant Personal, Educational, and Vocational Evidence

Spoor Park was 42 years old on the date of the hearing.  (Tr. 38)  She has a high school education, and completed additional training for a nail license and vocational school to become a licensed practical nurse ("LPN").  (Tr. 39, 48)  Her past work experience included work as a nail technician and as an LPN.  (*Id.*)

### B.     Medical Evidence Regarding Spoor Park's Physical Condition from the Relevant Period

On May 25, 2005 Spoor Park reported low back pain that, at times, radiated down her left buttock and calf.  (Tr. 284)  She reported that "[a]ll positions" were uncomfortable.  (*Id.*)  On examination, A. L. Itani, M.D. found Spoor Park was obese.  (*Id.*)  Her low back was nontender,

but she was tender over the left sciatic notch.  (*Id.*)  Her back movements were limited.  (*Id.*)  There was no atrophy, fasciculation, or gross motor deficit in any muscle group.  (*Id.*)  Her knee jerks were positive and her left ankle jerk was diminished compared to the right at the 1+.  (*Id.*)  Her straight leg raising was full.  (*Id.*)  The sensory examination was within normal limits and her posterior column function was intact.  (*Id.*)  Dr. Itani ordered a high resolution MRI scan and lumbar spine x-rays.  (*Id.*)  Dr. Itani performed decompressive surgery in August 2005.  (Tr. 459)

On April 20, 2007, Spoor Park established care with Satish Mahna, M.D.  (Tr. 458-60)  Spoor Park complained of low back pain that radiated into her left lower extremity and down to the knee or foot.  (Tr. 459)  She reported that her left leg would swell up and feel weak, and she would have numbness in her left foot.  (*Id.*)  She gained weight due to inactivity and had headaches.  (*Id.*)  Spoor Park's only medication was ibuprofen.  (*Id.*)  On examination, Dr. Mahna found Spoor Park's gait was normal and she was not in distress.  (*Id.*)  He found tenderness and mild spasm upon palpation in her lumbar paravertebral muscles.  (Tr. 460)  Dr. Mahna found Spoor Park's lumbar spine range of motion was restricted in all planes, with complaints of pain.  (*Id.*)  He found weakness of the bilateral lower extremities and hypesthesia in the left lower extremity.  (*Id.*)  Dr. Mahna diagnosed Spoor Park with lumbar sprain and disc herniation L5-S1.  (*Id.*)  He advised her to continue her present form of treatment, which was ibuprofen.  (*Id.*)

Spoor Park saw Dr. Mahna several times from August to December 2007.  (Tr. 422, 425, 437, 442, 444, 446, 448, 565)  Spoor Park reported several symptoms to Dr. Mahna, including low back pain with radiation into the left lower extremity and tingling, numbness, and weakness of the lower left extremity.  (Tr. 422, 425, 437, 442, 444, 446, 448, 449, 565)  Spoor Park reported that lifting, bending, and standing for a long time exacerbated her symptoms.  (Tr. 422, 425, 437, 442, 444, 448, 565)  Spoor Park rated her low back pain at level 6-7 (Tr. 422, 425, 437,

442) on a scale of 1 to 10. She also reported having headaches and "stress." (Tr. 425, 448, 565) Dr. Mahna found that Spoor Park walked unassisted with a nonantalgic gate and appeared to be in no acute distress. (Tr. 422, 425, 442, 444, 446, 448, 565) On examination, Dr. Mahna found lumbar paravertebral muscle tenderness with mild spasm at L5-S1, restricted range of motion in the lumbar spine with complaints of pain, and hypesthesia in the left L4-5-S1 dermatomes. (Tr. 423, 426, 438, 443-45, 449, 566) Spoor Park took Ibuprofen and sometimes took Lyrica to treat her symptoms (Tr. 422, 437, 442, 444, 446, 448, 565), and Dr. Mahna instructed her to continue that treatment or to take the ibuprofen by mouth after meals. (Tr. 423, 426, 438, 443, 449, 566) Dr. Mahna also recommended Spoor Park consider pain management, vocational rehab, a repeat high resolution MRI, and lumbar spine x-rays. (Tr. 447, 449, 566)

On February 19, 2008, Spoor Park went to the pain clinic of Dean C. Pahr, D.O. for evaluation of the chronic pain in her back and left leg. (Tr. 412) She reported she was taking ibuprofen. (Tr. 412) On examination, Spoor Park was alert, oriented, pleasant, and in no acute distress. (*Id.*) She reported pain in the sitting position on the left side of her back with the extension of her leg. (*Id.*) She had desensitized muscles across the lumbar sacral junction. (*Id.*) Dr. Pahr examined MRIs from before and after Spoor Park's microdiscectomy and noted some degenerative changes across her back and some significant fibrosis on the left side of her epidural space. (Tr. 412) Dr. Pahr found that Spoor Park had a displaced lumbar disc. (*Id.*) He recommended she continue with her ibuprofen and try Lyrica. (*Id.*) Spoor Park stated she did not want stronger medications. (*Id.*) She said she was willing to try left-sided transforaminal epidural injections at L4-L5 and L5-S1. (Tr. 412-13)

Spoor Park met with Dr. Mahna from January through July 2008. (Tr. 345, 350, 352, 382, 404-11, 415, 418) She reported various symptoms, including: low back pain at level 6/10, 6-7/10, or 7-8/10 with radiation into the left lower extremity; tingling, numbness, and weakness

of the left lower extremity; headaches; and "stress." (Tr. 345, 350, 352, 382, 404, 406, 408, 410, 415, 418) She reported that lifting, bending, standing for a long time, and weather changes all exacerbated her symptoms. (Tr. 345, 382, 404, 406, 408, 410, 415, 418) She was able to walk unassisted, with a nonantalgic gait, and appeared to be in no acute distress. (Tr. 345, 350, 352, 382, 404, 406, 408, 410, 415, 418) On examination, Dr. Mahna found lumbar paravertebral muscle tenderness with mild spasm at L5-S1, no focal trigger points, restricted range of motion in the lumbar spine with complaints of pain, and hypesthesia in the left L4-5-S1 dermatomes. (Tr. 346, 351, 353, 383, 405-11, 415, 419) She reported taking Naproxen or Ibuprofen, sometimes adding Lyrica (Tr. 345, 350, 352, 382, 404, 406, 408, 410, 415, 418), and Dr. Mahna recommended she continue that treatment. (Tr. 346, 351, 353, 383, 405, 407, 409, 411, 416, 419)

Spoor Park met with Dr. Mahna from August 2008 to January 2009. (Tr. 527-37, 539-45) She reported many of the same symptoms, including: low back pain at level 6-7/10, 7/10, or 7-8/10 with radiation into the left lower extremity; intermittent spasms in the back and left lower extremity, especially during the night; tingling, numbness, and weakness of the left lower extremity, and being "real achy." (Tr. 527, 529, 532, 534, 536, 539, 541, 543-45) She also reported that "there are days she can hardly get out of bed and feels like crying." (Tr. 536) She reported lifting, bending, standing for a long time, and weather changes exacerbated her symptoms. (Tr. 527, 529, 532, 534, 536, 539, 541, 543, 545) She was able to walk unassisted, with a nonantalgic gait and appeared to be in no acute distress. (Tr. 527, 529, 532, 534, 536, 539, 541, 543-45) On examination, Dr. Mahna found lumbar paravertebral muscle tenderness with mild spasm at L5-S1, no focal trigger points, and restricted range of motion in the lumbar spine with complaints of pain. (Tr. 528, 530, 533, 535, 537, 540, 542) She reported taking

Naproxen or Ibuprofen (Tr. 527, 529, 532, 534, 539, 541, 543-45), and Dr. Mahna recommended she continue that treatment. (Tr. 528, 530, 533, 535, 537, 540, 542)

Spoor Park met with Dr. Mahna in February and April 2009. (Tr. 502-16) She reported that her pain and numbness had increased after physical therapist Jonathan Strychasz's functional capacity evaluation. (Tr. 502) She reported that her back pain had worsened because she "slightly tripped" while going down the stairs due to the numbness in her left leg. (*Id.*) She said she "almost went to the emergency room" but was "popping pills" instead. (*Id.*) She reported symptoms, including: low back pain at level 7-10/10 or 9-10/10 with radiation into the left lower extremity; intermittent spasms in the back and left lower extremity; and tingling, numbness, and weakness of the left lower extremity. (Tr. 502-04, 506, 509) She reported lifting, bending, standing, and sitting "a certain way" exacerbated her symptoms. (Tr. 502, 504, 506) Spoor Park also reported that she went to the emergency room at Geneva Memorial Hospital, had an emergency MRI, and was advised to see a neurosurgeon as soon as possible. (Tr. 508) She was able to walk unassisted, with a nonantalgic gait and appeared to be in no acute distress. (Tr. 502, 504, 506) On examination, Dr. Mahna found lumbar paravertebral muscle tenderness with mild spasm, no focal trigger points, and restricted range of motion. (Tr. 503, 505, 507, 510) She reported taking Naproxen or Ibuprofen, Percocet, Vicodin, Skelaxin, and Prednisone (Tr. 502, 504, 506, and 509). Dr. Mahna prescribed Naprosyn and Ultram-ER and recommended she submit paperwork for authorization for a MRI scan. (Tr. 503) Later, he advised her to continue her present medications and go to the emergency room if she developed further deterioration or weakness. (Tr. 503, 510)

On May 2, 2009, Spoor Park saw Dr. Itani after a MRI revealed a herniated disc at L5-S1 going into the foramen on the left side. (Tr. 497) On examination, her low back was tender to persuasion, her back movements were limited, and there was weakness in the left hip extensors

and foot drop on the left side. (*Id.*) The other muscle groups were within normal limits and there was no atrophy or fasciculation. (*Id.*) Straight leg raising was 30 degrees on the left and full on the right. (*Id.*) There was diminished response to a pin throughout the left lower extremity compared to the right. (*Id.*) Dr. Itani recommended urgent microdiscectomy. (*Id.*)

Spoor Park met with Dr. Mahna three times in May 2009. (Tr. 338-41, 343-44) She reported symptoms, including: low back pain at level 6/10 or 7-8/10 with radiation into the left lower extremity; intermittent spasms in the back and left lower extremity, especially during the night; and tingling, numbness, and weakness of the left lower extremity. (Tr. 338, 340, 343) On May 1, 2000, she reported that the pain was worse in her left leg and foot than in her back. (Tr. 343) She reported lifting, bending, standing, and "sitting a certain way" exacerbated her symptoms. (Tr. 338, 343) She was able to walk unassisted, with a nonantalgic gait and appeared to be in mild distress due to pain. (Tr. 338, 340, 343) On examination, Dr. Mahna found lumbar paravertebral muscle tenderness with mild spasm at L5-S1, no focal trigger points, restricted range of motion in the lumbar spine with complaints of pain. (Tr. 339, 341, 344) She reported taking Naproxen, Skelaxin, Vicodin, and Ultram-ER (Tr. 338, 340, 343), and Dr. Mahna recommended she continue that treatment. (Tr. 339, 344)

On June 15, 2009, Dr. Itani performed a microdiscectomy to repair Spoor Park's herniated disk at L5-S1 on the left. (Tr. 337) Spoor Park's condition was satisfactory at the end of the surgery. (*Id.*)

On July 24, 2009, Spoor Park reported that she had numbness over her ankle and lateral aspect of her left foot. (Tr. 321) She complained of pain in the left side of her lower back, with radiation down to the left calf, weakness in her left leg and foot, and hypesthesia of the left L4-5-S1 dermatomes. (*Id.*) She ambulated unassisted with a nonantalgic gait. (*Id.*) She reported taking Ultram-ER, Naprosyn, and Flexeril. (*Id.*) Dr. Mahna found paravertebral tenderness with

mild spasm, no focal trigger points, and restricted range of motion. (Tr. 322) He encouraged

Spoor Park to continue physical therapy and taking Naprosyn. (*Id.*)

From July 2009 to October 2009, Spoor Park underwent physical therapy. (Tr. 296-309)

She reported pain in her left buttock, down her left leg, and into her foot. (Tr. 296, 298, 302,

304) She also reported that she had trouble sleeping and would take ibuprofen at night. (Tr.

297) At times she reported no increase in pain between the physical therapy sessions. (Tr. 299,

301) The physical therapist noted that Spoor Park still had weakness in her left leg. (Tr. 296)

He also found her left ankle was getting tighter and she was losing range of motion. (Tr. 298)

At the end of her therapy, Spoor Park had full range of motion in her right knee extension and

negative 15 degrees in her left knee. (Tr. 304) Her muscle strength increased from 2+/5 to 3-/5

in her dorsiflexion, but otherwise generally remained the same. (*Id.*) The physical therapist

recommended vocational rehabilitation to access return to work. (Tr. 305)

Plaintiff saw Dr. Mahna several times in August and September 2009. (Tr. 317-20) She

reported "burning aching" low back pain rated at level 5/10 or 6/10, with intermittent radiation

into the left lower extremity, weakness of the left leg and foot, and worsening symptoms with

sitting and standing too long. (Tr. 317, 319) She stated she wondered about starting

antidepressant medications. (*Id.*) Spoor Park was able to ambulate unassisted with a nonantalgic

gait. (Tr. 317, 319) She reported taking Ultram-ER, Naprosyn, and Flexeril. (Tr. 317, 319) Dr.

Mahna advised her to continue her treatment and consult a psychiatrist regarding her depression

issue. (Tr. 318)

Spoor Park met with Dr. Mahna in October, November, and December 2009. (Tr. 294,

310-14) She reported symptoms, including: aching and burning low back pain at level 5-6/10 or

7/10 with radiation into the left lower extremity; constant numbness of varying degrees of the

left foot, weakness of the left leg and foot, and worsening symptoms with sitting and standing for

long.  (Tr. 294, 310, 312, 314)  She was able to walk unassisted, with a nonantalgic gait and appeared to be in mild distress.  (Tr. 294, 310, 312, 314)  On examination, Dr. Mahna found lumbar paravertebral muscle tenderness with mild spasm, no focal trigger points, and restricted range of motion.  (Tr. 294, 310, 312, 314)  She reported taking Ultram-ER, Naproxen, and Flexeril (Tr. 294, 310, 312, 314), and Dr. Mahna recommended she continue that treatment.  (Tr. 295, 311, 313, 315)

 **C.**  **Medical Evidence Regarding Spoor Park's**
     **Physical Condition after the Relevant Period**

 On October 15, 2010, Spoor Park reported to Dr. Mahna that it was hard for her to get out of the bed in the morning.  (Tr. 782)  She complained of ongoing aching, burning, low back pain, rated at 7/10 with radiations into the left calf and at times the top of the left foot, constant aching with intermittent throbbing right groin pain; constant numbness of the left foot; intermittent "shocking numbness" in the lower right extremity, weakness in the left leg and foot, and worsening symptoms with sitting and standing for too long.  (Tr. 782)  She also reported that when ascending stairs her right leg felt weak and he right groin would hurt.  (*Id.*)  She ambulated unassisted with a nonantalgic gait and appeared to be in mild distress due to pain.  (*Id.*)  An x-ray of Spoor Park's pelvis and bilateral hips on October 4, 2010 reportedly was negative and showed preserved bilateral hip joint spaces, no focal bony lesion, and no fracture or subluxation.  (Tr. 783)  Dr. Mahna prescribed Percocet and recommended Spoor Park consider a pain consultation.  (*Id.*)

 **D.**  **Medical Evidence Regarding Mental Impairments**

 The record contained no evidence of psychological treatments prior to October 2007.  In October 2007, Spoor Park began counselling at Weinstein and Associates, Inc.  (Tr. 430-35, 439, 477-78, 538)  She reported difficulty sleeping (Tr. 430-35, 477), anxiety (Tr. 430-31, 433, 439), low tolerance for stress (Tr. 430), irritability (Tr. 430-31), and low energy.  (Tr. 477)  She

presented symptoms of depression, flat affect, difficulty concentrating, and/or impaired memory. (Tr. 431-35, 477)  At times she would exhibit pain behaviors throughout her counselling session. (Tr. 432, 435)  She reported missing the social part of her job, yet not feeling like being around anyone.  (Tr. 477)  She rejected pharmacological treatment due to concerns of their interaction with her pain medication and concern that using different medications would impair her ability to care for her infant daughter.  (Tr. 431)

### E. Opinion Evidence

#### 1. Ira J. Ungar MS, M.D., FACEP, CIME – Certified Independent Medical Evaluator

##### a. July 14, 2005 Opinion

Ira J. Ungar, M.D., evaluated Spoor Park twice.  On July 14, 2005, Spoor Park reported that she had no improvement in her lower back pain despite multiple courses of physical therapy. (Tr. 278)  An MRI revealed several small disc herniations with potential neural impingement, but no specific nerve roots were impinged.  (*Id.*)  Dr. Ungar found that the multiple physical examinations in Spoor Park's file reveled significantly varied findings.  (*Id.*)  He noted that electrodiagnostic studies revealed a mild subacute L5 radiculopathy and epidural injections generated no improvement in symptomatology.  (*Id.*)  Although Spoor Park's complaints were at "moderately severe levels," objective evaluation "noted full range of motion performed vigorously, but dramatic breakaway weakness of the left lower extremity at the knee and ankle in both flexion and extension."  (*Id.*)  Dr. Ungar stated, "If this truly represented her physical capabilities, Ms. Spoor would have been unable to stand or walk."  (*Id.*)  Dr. Ungar further note that despite Spoor Park's reports of moderately severe levels of pain, she "freely laughed throughout the evaluation."  (*Id.*)  Dr. Ungar noted Spoor Park had undergone all reasonable conservative treatment, including physical therapy and epidural steroid injections, without improvement in her subjective complaints and recommended that a spinal surgeon evaluate

Spoor Park's two disc herniations.  (*Id.*)  Dr. Ungar's objective evaluation did not support that Spoor Park's conditions existed or were related to the occupational incident in Spoor Park's claim.  (Tr. 279)  Dr. Ungar recommended Spoor Park undergo a surgical evaluation and then surgery, if it was recommended.  (*Id.*)  He opined that if Spoor Park did not want to accept surgical decompression, no further diagnostic or therapeutic intervention would be appropriate because Spoor Park would be considered at maximum medical improvement.  (*Id.*)

### b.      May 16, 2007 Opinion

On May 16, 2007, Dr. Ungar evaluated Spoor Park a second time.  (Tr. 470-76)  Spoor Park again complained of low back pain radiating to her left leg and numbness and tingling in her left foot and back of her leg.  (Tr. 471)  She rated her discomfort as a 6 out of 10, which is moderately severe to excruciating, even though she only used ibuprofen to control her symptoms.  (*Id.*)

On examination, Dr. Ungar found Spoor Park's physical exam activities were performed with "dramatically exaggerated pain behaviors."  (Tr. 473)  Spoor Park's spine was normal other than vague discomfort upon palpation of the paralumbar musculature.  (*Id.*)  He noted that Spoor Park was able to casually move about the examining room without discomfort, but she performed limited heel rise, toe rise, and deep knee bend with continual complaints.  (*Id.*)  Dr. Ungar observed "exaggerated complaints of discomfort at extremes of range of motion."  (*Id.*)  During the exam, Spoor Park had limited sacral flexion range of motion, but while sitting on the examining chair and table she revealed a flexion angle approaching 90 degrees.  (*Id.*)  Neurological testing revealed her muscles to be completely normal and symmetrical bilaterally.  (*Id.*)  There was no evidence of leg atrophy.  (Tr. 473)  Dr. Ungar noted "[s]ubstantial exaggerated pain behavior was demonstrated and many of Waddell signs for somatic amplification are positive suggesting significant symptom magnification."  (*Id.*)  He noted that

simply squeezing the fatty tissue of the buttock on the left elicited yelps of discomfort even to light pressure. (*Id.*) Palpation across the entire lumbar region also elicited discomfort. (*Id.*) Dr. Ungar noted that straight leg raising was performed to 90 degrees in the sitting position but only 45 degrees bilaterally in the lying position due to complaints of low back pain. (Tr. 474) Dr. Ungar noted that Spoor Park was exhibiting "dramatic breakaway weakness" to even fingertip pressure in both lower extremities so severe that if it "truly represented her physical capabilities, Ms. Spoor [Park] would be unable to stand or walk." (*Id.*) Dr. Ungar noted that Spoor Park significantly limited her range of motion at the formal evaluation, but was able to "bend over on two occasions from the seated position and pick up toys from the floor with a sacral flexion angle exceeding 90 degrees." (*Id.*) Dr. Ungar observed Spoor Park "transporting her eight month old in a stroller to her motor vehicle, lifting the child from the stroller, and placing it in the car seat." (*Id.*) Spoor Park was also "able to laugh freely throughout the evaluation, despite complaining of pain at moderately severe levels." (*Id.*)

Dr. Ungar noted that after Spoor Park's lumbar disc herniation was decompressed in August 2005, the surgeon indicated improvement of symptoms and the postoperative MRI did not indicate any further neurologic impingement. (*Id.*) But Spoor Park continued to report pain up to excruciating levels, even though she was able to become pregnant, carry the child throughout year 2006, and deliver a healthy child. (*Id.*) Spoor Park continued to complain of lower back pain, was referred to a pain specialist, and considered a spinal cord stimulator, even though she was only using ibuprofen to control her symptoms. (*Id.*) He found the physical evaluation was most notable for "symptom magnification and misrepresentation." (Tr. 475) He found that Spoor Park's observed abilities were far greater than those she demonstrated at the objective physical evaluation. (*Id.*) Dr. Ungar stated, "What is quite clear is that issues of secondary gain appear to be the most significant factor involved with persistence of subjective

complaints." (*Id.*) Dr. Ungar found that Spoor Park had essentially resolved the vast majority of her lower back issues based on the operative decompression of her disc herniation. (*Id.*)

Dr. Ungar opined that further treatment would only support ongoing disability and illness behavior and would not promote wellness. (*Id.*) He opined that because there was "no objective evidence of ongoing weakness as noted by normal gait and ability to manage an eight-month-old child" Spoor Park was capable of returning to work at her previous level of employment without restrictions, if she would so choose. (Tr. 475-76)

### c.     May 7, 2008 Opinion

Dr. Ungar reviewed Spoor Park's file and evaluated her on May 7, 2008. (Tr. 347-49, 374-381) During the evaluation, Spoor Park complained of low back pain radiating into her left leg and numbness and tingling of her left foot and traveling down the back of her leg. (Tr. 348, 375) She indicated the severity of her discomfort was six to ten on a scale of ten, which is moderately severe to excruciating. (*Id.*) He noted that Spoor Park used only ibuprofen, and occasionally Percocet, to control her symptoms. (*Id.*) Spoor Park indicated that she had experienced excruciating pain twenty out of prior thirty days, but she reported she only used Percocet two or three days in the preceding month. (*Id.*) She rated her pain at seven out of ten on the day of the examination, but Dr. Ungar noted she smiled and laughed freely throughout the evaluation. (*Id.*)

Dr. Ungar stated the physical examination was "grossly abnormal and non-physiologic." (Tr. 349, 377, 379) On examination, there was no evidence of atrophy, spasm, dissymmetry, or loss of lordosis in the lumbosacral spine and no evidence of atrophy in the upper or lower leg. (Tr. 377-78) There was "vague discomfort" upon palpation of the paralumbar musculature and straight leg raise in the lying position. (Tr. 377) Spoor Park was able to casually move about the examining room without discomfort. (*Id.*) Spoor Park performed limited heel rise, toe rise, and

deep knee bend with "continual complaints." (*Id.*) The lumbosacral range of motion was less than normal, yet, while sitting on both the examining chair and table, Spoor Park revealed a sacral flexion angle approaching 90 degrees "in direct contradistinction to the range of motion seen at formal physical exam." (Tr. 377-38) "There were exaggerated complaints of discomfort at extremes of range of motion." (Tr. 378) Neurologic testing of Spoor Park's muscles revealed results that were completely normal and symmetric bilaterally. (Tr. 378)

Dr. Ungar observed "[d]ramatic breakaway weakness of the entire left lower extremity . . . suggesting (impossibly) near complete paralysis of the extensor muscles of the ankle." (Tr. 349, 379) He opined that "the overwhelming evidence of physical examination is that symptom magnification and misrepresentation was at dramatic levels and completely inconsistent with objective observation." (Tr. 349, 377-78) He found that the Spoor Parks demonstrations during the objective evaluation were "grossly inconsistent and not representative of her true condition." (Tr. 349)

Dr. Ungar reiterated many of the opinions that he had stated in his previous opinion issued on May 16, 2007. (Tr. 378-81) He again opined that Spoor Park's complaints were "far more likely related to '[i]ssues of secondary gain' rather than the occupational incident of th[e] claim." (Tr. 379) He opined that, if she desired, Spoor Park could return to work at her previous level of employment without restrictions. (Tr. 380-81) He opined Spoor Park had reached maximum medical improvement. (Tr. 380)

### 2.   Donald Jay Weinstein, Ph.D. – Psychologist Examiner

On December 20, 2005, Spoor Park reported that she was under stress due to money issues, staying at home all the time, and being in pain. (Tr. 291) Spoor Park reported pain down her left leg that went into her feet sometimes, but mostly the left foot. (*Id.*) She reported that

sometimes she yelled and was "real emotional," grouchy, and withdrawn. (*Id.*) She reported her leg was weaker than it was before. (Tr. 292)

Spoor Park had never spoken to a mental health professional prior to the interview. (*Id.*) She reported that on a good day she would go to physical therapy, go home, and try to do housework, although she said she was usually limited due to pain. (*Id.*) She stated she would try to go to the grocery store, but could not carry what she used to. (*Id.*) She stated she could not carry more than five or ten pounds. (*Id.*) She reported that on bad days she would not leave home, shower, or get out of her pajamas and would be alone and do nothing. (Tr. 292-93) She reported she did not try to attend her daughters' sporting events. (Tr. 292) She stated she stopped being involved in sports and socializing after sporting events. (*Id.*) She stated she would go out to dinner, but would always be ready to go home. (*Id.*)

Dr. Weinstein found Spoor Park was oriented in all spheres and demonstrated no symptoms of cognitive dysfunction. (Tr. 293) She presented with vegetative symptoms of depression. (*Id.*) She reported being irritable and socially withdrawn. (*Id.*) Spoor Park reported that pain made her deficits in memory, lack of ability to concentrate, and ability to remember what she is doing worse. (*Id.*) She reported a decrease in libido because she experienced pain during and after intercourse. (*Id.*) She reported she feared re-injuring herself, being irritable and snappy with her family, and isolating herself socially. (*Id.*) She reported eating too much and having gained weight since her injury. (*Id.*) She stated she felt helpless and out of control. (*Id.*)

Dr. Weinstein diagnosed Spoor Park with mild major depressive disorder, single episode that was a direct and proximate result of the industrial injury of September 20, 2004. (*Id.*) He found she was in need of psychotherapy, could not work as an LPN, and was temporarily and totally disabled at that time. (*Id.*)

### 3. Magdi S. Rizk, M.D. – Forensic Psychiatrist

Forensic psychiatrist, Magdi S. Rizk, M.D., performed two psychiatric evaluations of Spoor Park. On March 7, 2006, Spoor Park reported to Dr. Rizk that she could not use the vacuum or bend over without support, but could squat with support. (Tr. 620) She reported she could not lift more than ten pounds. (*Id.*) She stated she was prescribed Motrin and Darvocet. (*Id.*) She stated she could drive and shower. (*Id.*) She reported that "had lost her initiative" and felt sad, unhappy, and, at times, depressed. (*Id.*) She reported lost income and poor sexual relations strained her marriage. (Tr. 620-21) She rated her pain at 6-7/10 and her depression at 7-8/10 on an ascending scale. (*Id.*) She reported occasional crying spells. (*Id.*) She did not seek or receive any psychiatric treatment and expressed a lack of desire for pharmacological treatment if needed. (*Id.*)

Dr. Rizk noted that Spoor Park was smiling during the interview and was personable and neatly dressed. (Tr. 622) He found her mood was "'subjective' 'depressed'" and her affect was euthymic. (*Id.*) She was oriented to time, place, and person, her memory was intact, and she did not endorse any delusional beliefs, hallucinations, or paranoid ideation. (*Id.*) She was able to concentrate very well and could recall three out of three objects after five minutes. (*Id.*) Her abstract abilities were good, as were her judgment and insight. (*Id.*) She was not lethargic, was very engaging, and did not display any signs of possible loss of control. (*Id.*)

Dr. Rizk did not diagnose Spoor Park with any mental impairment or disorder. (Tr. 623) He found Spoor Park's worries regarding her income, housing situation, and strained marital relations did not constitute a psychiatric illness. (*Id.*) He found Spoor Park did not suffer from any moderate or severe depressive symptoms and did not fulfill the criteria for major depression. (*Id.*) He noted there was no documentation of any psychiatric complaints in her records and she did not seek any psychiatric treatment from September 20, 2004 to the date of her evaluation.

(*Id.*)  Dr. Rizk found Spoor Park's statements to be inconsistent because she told Dr. Weinstein that her symptoms started after her injury, but she told Dr. Rizk her symptoms started after her surgery.  (*Id.*)  Dr. Rizk's review of Spoor Park's "records revealed exaggeration of symptoms and *absence* of 'consistent reproducible physical findings in the face of obvious symptom magnification and misrepresentation' [], i.e. the claimant does not suffer from any <u>serious</u> physical sequelae which may result in major depression."  (*Id.*) (Emphasis in original)  Dr. Rizk noted that Spoor Park had received no psychiatric treatment for 18 months and there was no documentation of psychiatric complaints since the injury, and opined that Spoor Park did not carry a psychiatric diagnosis.  (*Id.*)  Dr. Rizk did not recommend any future psychological treatment.  (*Id.*)  He opined Spoor Park was "obviously not temporarily and totally disabled based solely on her psychological condition."  (Tr. 624)

Almost a year later, on January 9, 2007, Dr. Rizk performed a second psychiatric evaluation.  (Tr. 464-69)  Spoor Park complained of poor sleep, inability to play sports, and feeling depressed, moody, and argumentative.  (Tr. 466)  She reported poor sexual relations and poor finances.  (*Id.*)  She was not taking any medications, but was being counselled bi-weekly by Kathleen Rednour, at Weinstein and Associates.  (Tr. 466-67)  She reported that she had improved "maybe 20%" during the year of treatment.  (Tr. 467)

Dr. Rizk found Spoor Park was personable and her speech was coherent, relevant, and spontaneous.  (Tr. 468)  Her mood was subjective, "depressed," and nonchalant.  (*Id.*)  Dr. Rizk observed no signs of anxiety or depression or psychotic features.  (*Id.*)  Her memory was intact, she could concentrate fairly well, and her mathematical and abstract abilities and judgement and insight were good.  (*Id.*)

Dr. Rizk noted that Spoor Park had been diagnosed with mild major depressive disorder.  (*Id.*)  He noted that she was not receiving any psychotropic medications, even though "[i]t is a

well-known psychiatric fact that the *best single* treatment for major depression is pharmacological treatment." (*Id.*) (Emphasis in original) He opined that to receive only psychotherapy is ineffective. (*Id.*) He noted that Spoor Park declared bankruptcy in 1995, before she was injured. (*Id.*) He noted that Dr. Ungar's report reflected serious inconsistencies on physical examination which casted doubt on Spoor Park's subjective complaints. (*Id.*)

Dr. Rizk opined Spoor Park's depressive symptoms were insignificant, not compelling, and objectively mild. (Tr. 469) He opined no further psychological treatment was warranted. (*Id.*) He opined Spoor Park was capable of returning to work without restrictions based solely on her allowed psychological condition. (*Id.*)

### 4. Other Opinion Evidence

Other medical sources expressed opinions regarding Spoor Park's physical condition. Because Spoor Park raises no issues regarding the ALJ's evaluation of these opinions, it is unnecessary to summarize them here. The opinions were from an occupational physician, Elizabeth Mease, M.D., and neurologist Gary R. Kutsikovich, M.D.

### 5. Walter Belay, Ph.D. – Intendent Psychological Examiner

On April 3, 2008, Walter Belay, Ph.D. performed a psychological examination of Spoor Park to determine the extent of her disability and the appropriateness of treatment. (Tr. 362) Dr. Belay found Spoor Park cooperative and exhibited good grooming and hygiene, and normal posture, body movement, and walking gait. (Tr. 363) Dr. Belay noted that Spoor Park was able to pick up her toddler without difficulty. (*Id.*) He found her facial expressions did not reflect any negative affect or mood and her eye contact was good. (*Id.*) Her tone of voice, rate of speech, and manner of speech were normal and her stream of speech was logical and coherent. (*Id.*)

Spoor Park reported lower back pain that radiated down her left leg and numbness in her left foot. (Tr. 363) She reported that standing, walking, or sitting for too long exacerbated her symptoms. (*Id.*) She reported taking Advil to treat her pain, because she claimed she could not tolerate stronger pain medications because they made her nauseous. (*Id.*) She also reported joint pain and diarrhea. (*Id.*)

She reported feeling overly emotional and depressed, crying often, having arguments with her husband, and having concentration problems. (Tr. 364) She reported that she had been seeing a therapist every two weeks for the past year and that she felt "somewhat better since working with them." (*Id.*) She reported that her primary emotion at the time of the evaluation was anxiety, but she said she also felt depressed, fearful, and angry. (*Id.*) She also related having experienced racing thoughts, trouble thinking and concentrating, and feeling irritable, restless, and fidgety. (*Id.*) She stated she had difficulty falling and staying asleep and was only sleeping between two to four hours a night. (*Id.*) She stated she had gained weight and that she had decreased sexual responsiveness, little to no sexual desire, and painful menstrual periods. (*Id.*)

Spoor Park stated her depression began in August 2005, shortly after she had surgery to treat back injuries she suffered when caring for a combative patient. (Tr. 364-65) She stated she began to feel negative and depressed because the surgery did not work as she had hoped it would. (Tr. 365) She stated she had been receiving psychological care twice a month for about three years. (*Id.*)

Spoor Park opined that she was impaired because: her depression made it difficult to concentrate and sleep; she said suffered negative intrusive thoughts; she woke up in the night; and her energy and motivation levels were low. (*Id.*)

Spoor Park reported that she maintained a close relationship with her family and friends, but did not leave her home very often or participate in the activities, hobbies, and sports that she used to find pleasurable. (Tr. 366) She stated she had three to six close friends. (*Id.*) She stated she did not believe she was overly dependent or demanding. (*Id.*) She denied having any interpersonal difficulties or significant life stressors. (*Id.*)

Spoor Park reported that on a typical day, she would remain at home unless she had a doctor's appointment; and she cared for and did activities with her young daughter. (Tr. 367)

Dr. Belay found Spoor Park to be well oriented. He noted that she complained of attention and concentration difficulties, but such difficulties were not evident during the evaluation. (*Id.*) He noted that she complained of memory problems, but, on assessment, her immediate and short-term visual memory were both intact. (*Id.*) Dr. Belay found Spoor Park's mental arithmetic computational ability was intact and suggested adequate attention and concentration. (*Id.*)

Dr. Belay administered the Minnesota Multiphasic Personality Inventory-2, and found Spoor Park responded in a valid manner. (*Id.*) He found the Clinical Scales revealed moderate distress characterized by worry, tension, agitation, and a dysphoric mood. (*Id.*) He found that at times she may have been anhedonic, she worried about something or someone all the time, her feelings were easily hurt, and she may have difficulty "getting going." (Tr. 368) Spoor Park reported problems with attention, concentration, and memory and appeared to be lacking in self-confidence. (*Id.*) She reported that she was worried about her health and sometimes experienced gastrointestinal and neurological symptoms. (*Id.*) Dr. Belay found the Content Scales indicated Spoor Park had significant degrees of anxiety, depression, health concerns, social discomfort, and work interferences. (*Id.*) Dr. Belay also reviewed Spoor Park's medical records. (Tr. 368-70)

Dr. Belay found Spoor Park appeared to be fully capable of dealing with a rather lengthy evaluation while at the same time caring for a young child. (Tr. 371) He found she did not exhibit any difficulties with concentration, attention, persistence, or pace. (*Id.*) He noted that Spoor Park appeared to be energetic and well-focused during the evaluation. (Tr. 371) He noted that Spoor Park claimed to have received three years of psychological treatment, but that her records indicated she had received at most two years of treatment, with some disruption of treatment, possibly due to the delivery of her child. (*Id.*) Dr. Belay noted that throughout her treatment, Spoor Park had been reluctant to use antidepressant medication, allegedly due to her fears that it would interact negatively with her pain medication, even though Spoor Park was only using Advil. (*Id.*) He opined that "[c]ertainly her recovery from depression was significantly hampered by the fact that she did not use antidepressant medication," because the research indicated that individuals recover most quickly and effectively when they receive a combination of medication and psychological therapy. (*Id.*)

Dr. Belay opined that Spoor Park suffered from a mild form of depressive disorder that would not prevent her from returning to her previous employment. (Tr. 371-72) He opined that she "should begin to phase out her psychological counselling" and/or use antidepressant medication. (Tr. 372) He opined that, unless she decided to take antidepressant medication, she had reached maximum medical improvement in terms of her allowed psychological condition. (Tr. 371-72) Dr. Belay opined that Spoor Park could return to her previous level of employment, because her depression was mild and she appeared capable of performing the duties of her job if one did not consider her physical limitations. (Tr. 371)

### 6. Kathleen A. Rednour, M.S.S.A., LISW – Treating Social Worker

On June 6, 2008, Kathleen A. Rednour, M.S.S.A., LISW prepared a letter in response to Dr. Belay's opinion. (Tr. 355-56) Social worker Rednour wrote that Spoor Park had "been

working very diligently on cognitive re-structuring in therapy and ha[d] responded very well."

(Tr. 355)  She noted that Spoor Park went to therapy every other week and had made "significant

progress."  (*Id.*)  She stated the focus of Spoor Park's therapy was for her to accept not being

able to return to her former position as a nurse at University Hospital due to the physical

limitations that resulted from her industrial injury on September 20, 2004.  (*Id.*)  She opined that

Spoor Park presented with depression, flat affect, depressed mood, difficulty concentrating,

impaired memory, irritability, difficulty sleeping, and anxiety about potential surgery.  (*Id.*)  She

opined that Spoor Park either had not attempted or was interrupted in her attempts to interact

socially and outside of her home.  (*Id.*)  She noted that Spoor Park had a decrease in depressive

symptoms, but continued to report that she felt helpless and hopeless most of the time, struggling

to get out of bed.  (*Id.*)  Ms. Rednour stated she would decrease the number of therapy sessions

due to Spoor Park's improvement and that she anticipated Spoor Park would end her therapy in

six months.  (Tr. 356)  Ms. Rednour opined that Spoor Park should not be considered to have

reached maximum medical improvement and would likely make further progress.  (*Id.*)

### 7.     Jonathan Strychasz, PT, CWCE – Physical Therapist

On February 18, 2009, Jonathan Strychasz, PT, CWCE evaluated Spoor Park's physical

functional capacity.  (Tr. 517-19)  He found she was providing full physical effort based on

computer analysis, compensatory postures, her heart rate, and her wiping her hands, starting

prior to the start command, and holding her breath.  (Tr. 517-18)  He found Spoor Park was not

capable of performing her pre-injury job as a LPN.  (Tr. 518)  Mr. Strychasz found Spoor Park's

subjective reports of pain and disability could be considered reasonable and reliable based on the

correlation of her scores on the Visual Analog Scale and the Functional Pain Scale, consistent

repetitive motion screening, Spinal Function results, and 0/7 Waddell's Signs.  (*Id.*)  He found

Spoor Park had symptoms down her entire left side and into her left foot, range of motion loss in

22

her lumber extension, and neurological weakness of her left anterior tibialis and peroneals graded at a 4/5. (Tr. 519) He recommended additional MRI imaging and placement into a vocational rehabilitation program to include active physical therapy three times per week for four weeks with a transition to work conditioning at a frequency of three to five times per week for six weeks. (*Id.*)

### 8. Abdul Latif Itani, M.D. – Treating Physician

On October 14, 2009, Dr. Itani wrote a letter in which he noted Spoor Park had a herniated disc at L4-L5 on the left in 2005 and at L5-S1 on the left in 2009. (Tr. 316) He noted that she was not able to fulfill all the requirements to return to work as an LPN despite having undergone industrial rehabilitation, physical therapy, and occupational therapy. (*Id.*) On examination her back was tender to the touch and her back movements were limited, although there were no atrophy or fasciculation. (*Id.*) There was weakness of the plantar flexors and dorsiflexors, but the other muscle groups were within normal limits. (*Id.*) Spoor Park's left lower extremity showed diminished response to pin compared to the right. (*Id.*)

Dr. Itani opined that he had never seen a patient with an industrial injury go back to the same job after being out of work for about five years. (*Id.*) He recommended that she go strictly into vocational rehabilitation. (*Id.*)

### 9. Satish Mahna, M.D. – Treating Source

Satish Mahna, M.D. completed numerous check-box forms entitled "Physician's Report of Work Ability" between September 18, 2009 and October 19, 2012 ("work ability reports"). (Tr. 883-910) Dr. Mahna only completed two of the forms during the relevant period. (Tr. 883-84) On every form Dr. Mahna only checked one box and left the rest blank. (*Id.*) Each form indicated that Spoor Park was "totally disabled from work" within specified dates, usually a month or two. The two forms in the relevant period indicated Spoor Park was totally disabled

from September 18, 2009 to March 18, 2010. (Tr. 883-884) In total, Dr. Mahna's forms indicated Spoor Park was totally disabled from work until January 30, 2013. (Tr. 883-909) In response to the question asking why Spoor Park was unable to work, Dr. Mahna only put the following ICD-9 codes: 722.10, 722.83, 847.2, and 296.20. (Tr. 883-908) Notably, the check box forms had places in which the doctor could have rated the patient's ability to lift and carry, to bend, twist, turn, reach below the knee, push/pull, squat/kneel, stand/walk, sit, and lift above the shoulders. In completing the forms, Dr. Mahna provided no information on these issues at all. He also provided no information on the existence of hand restrictions or the need to change postural positions.

### 10. Joseph Marino, M.D., ABIME – Independent Medical Examiner

On June 18, 2010 – after the relevant time period – Joseph Marino, M.D. evaluated Spoor Park's functional capacity. (Tr. 776-79) Spoor Park reported constant, achy, burning, stabbing pain, rated at 5-6/10 across her lower back, intermittent pain rated at 5-6/10 in her left buttock and posterior thigh that radiated to her calf and foot, numbness in her toes and the dorsum of her left foot and lower leg, and weakness in her left foot. (Tr. 777) She reported having difficulty lifting more than 20 pounds. (*Id.*) She reported she could not "tolerate prolonged sitting more left lower extremity." (Tr. 777-78)

Dr. Marino opined Spoor Park could not return to her former position of employment as an LPN because she would not be able to tolerate the bending, lifting, pulling, reaching, and prolonged periods of working on her feet required of an LPN in a hospital setting. (Tr. 779) He opined that Spoor Park would be limited to a light to medium physical demand level. (*Id.*)

### 11. Jan Gorniak, D.O. and Elizabeth Das, M.D. – State Agency, Non-Examining Physicians

On October 7, 2013, Jan Gorniak, D.O., assessed Spoor Park's physical residual functional capacity based upon a review of her medical records. (Tr. 100-03) Elizabeth Das,

M.D. assessed Spoor Park's physical residual functional capacity on December 11, 2013.  (Tr. 117-19)  Because both state agency reviewing physicians reached the same conclusions regarding Spoor Park's physical RFC, only Dr. Gorniak's opinions are summarized below.

Dr. Gorniak opined that Spoor Park could lift and/or carry 20 pounds occasionally and 10 pounds frequently.  (Tr. 100-01)  She could stand, walk, and/or stand six hours in an 8-hour workday and her ability to push and/or pull were unlimited other than the limitations on her ability to lift and carry.  (Tr. 101)  Dr. Gorniak opined Spoor Park could: frequently climb ramps and stairs, crouch, or kneel; occasionally stoop or crawl; never climb ladders, ropes, or scaffolds; and engage in unlimited balancing.  (*Id.*)  Dr. Gorniak opined Spoor Park did not have manipulative, visual, or communicative limitations.  (Tr. 102)  Dr. Gorniak opined Spook Park should avoid concentrated exposure to extreme cold and avoid all exposure to hazards.  (*Id.*)

**F.      Hearing Testimony**

**1.      Claimant's Hearing Testimony**

On February 23, 2016, Spoor Park testified at the administrative hearing that she lived with her husband and 9-year-old daughter.  (Tr. 43)  She stated during the period from 2004 through 2009, she did household chores that consisted of "simple tasks" and prepared her daughter for school.  (Tr. 44-45)  She stated her family or friends would assist her in doing household chores, preparing meals, shopping for groceries, taking care of her daughter, and driving her daughter to preschool.  (Tr. 44-45, 49)  Spoor Park stated it was hard to lift her daughter once she weighed more than ten pounds and she would put the child in a stroller to do as little lifting as possible.  (Tr. 46)  She would drive her daughter to preschool "here and there," and would drive to doctor appointments.  (Tr. 46-47)

She graduated from high school and went to vocational school to get her LPN. (Tr. 48) Spoor Park stated she had not worked with the Bureau of Vocational Rehab and only was only receiving medical benefits from her workers compensation claim. (Tr. 48)

She stated she kept in touch with her parents and sisters, who lived close by, and her aunts and close friends. (Tr. 47) Before her injury, she played sports, like bowling and softball; and she scrapbooked. (*Id.*) She stated she belonged to no clubs or organizations. (Tr. 49) She said she listened to the television before going to sleep at night and would "glance" at magazines or newspapers, but would not be interested for long because her "mind just race[d]." (*Id.*)

Spoor Park testified that on a normal day during the relevant time period, she had trouble sleeping, was groggy in the morning if she had to take her daughter to school, and would lie down to sleep more, sometimes without showering. (Tr. 50) After her daughter returned home, Spoor Park prepared snacks and dinner, helped with homework, and then put her to bed, usually with her husband's or family's help. (Tr. 50)

Spoor Park was injured and herniated the discs in her back while dealing with a patient when she worked as an LPN. (*Id.*)

Spoor Park stated she did physical therapy, underwent pain management, had a series of injections, tried a spinal cord stimulator, and had a microdiscectomy in 2005. (Tr. 54-55) She stated the surgery failed and she still felt numbness and tingling down her leg and would trip and fall "all the time." (Tr. 55) She stated in 2009 she had her second microdiscectomy at the L5-S1 level after she collapsed and had to go to the emergency room. (*Id.*) She stated she did not regain the feeling in her legs after the surgery. (Tr. 56) She had a third fusion surgery in 2012, but she still experienced pain and numbness down her leg. (*Id.*) She stated she was unable to sit or stand for more than 5-10 minutes and she could not sleep comfortably, even after taking sleeping pills. (*Id.*) Spoor Park testified that on good days she would "try to do something a

little bit more and then it would keep [her] down for longer," make her pain worse, and cause her to lie around and not do anything for the next three to four days because of the pain. (Tr. 57)

Spoor Park stated she saw a psychiatrist named Dr. Smith, who prescribed Ambien and Cymbalta. She said the Ambien helped her to sleep, the Cymbalta helped with some of her nerve pain, and the medications also helped with her depression. (Tr. 58) She said the medications made her groggy and tired, but caused no other side effects. (*Id.*) She stated her back pain was a bigger problem than her depression during the period from 2004 to 2009, although the problems were "combined." (*Id.*)

Spoor Park testified that after her last surgery she began using a back brace. (Tr. 59) She said she used a walker at home and had asked for an ankle brace, although her doctors declined to prescribe one. (Tr. 59) She said she also used a cane around her home. (Tr. 60) Spoor Park stated she had headaches two to three times a month that would last for a couple of days. (Tr. 61) She stated she had recently fractured her right tibia and fibula when she tripped and fell. (Tr. 62) She said she joined a gym and tried to exercise on a bike and a treadmill, but could not because her foot would give out. (Tr. 62-63)

## 2. Vocational Expert Testimony

Vocational rehabilitation counselor Deborah Lee also testified at the hearing, indicating generally that a hypothetical worker with Spoor Park's limitations would not be able to perform Spoor Park's past work. But that same individual could do other jobs available in significant numbers in the national economy, so long as the person did not have to miss four days of work per month or be off task twenty percent of the work day. Because plaintiff has raised no challenge to the ALJ's analysis of the opinions of the VE, it is not necessary to further summarize the VE's testimony and opinions.

## IV.    ALJ's Findings and Decision

The ALJ's May 3, 2016 decision contained the following findings relevant to the issues

raised in this appeal:

1.    Spoor Park last met the insured status requirements of the Social Security Act on December 31, 2009.  (Tr. 15);

3.    Through the date last insured, Spoor Park had the following severe impairments: degenerative disc disease of the cervical and lumbar spine, peripheral neuropathy and obesity (20 C.F.R. 404.1520(c)).  (Tr. 16);

5.    After careful consideration of the entire record, the ALJ found that, through the date last insured, Spoor Park had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except is able to occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds, is able to stand and walk six hours of an eight-hour workday, is able to sit for six hours of an eight-hour workday, unlimited push and pull other than shown for lift and/or carry; occasionally climb ramps and stairs; never climb ladders, ropes and scaffolds; avoid concentrated exposure to extreme cold; avoid all exposure to hazards (unprotected heights and fast moving machinery); occasionally balance, stoop, crouch and crawl; frequent kneeling; would require a sit/stand option at will to shift position and change position  (Tr. 17-18);

6.    Through the date last insured, Spoor Park was unable to perform any past relevant work (20 CFR 404.1565).  (Tr. 20);

10.   Considering Spoor Park's age, education, work experience, and residual functional capacity, she had acquired work skills from past relevant work that were transferable to other occupations with jobs existing in significant numbers in the national economy (20 CFR 404.1569, 404.1569(a) and 404.1568(d)).  (Tr. 21).

Based on her eleven findings, the ALJ determined that Spoor Park was not disabled at

any time from September 20, 2004, the alleged onset date, through December 31, 2009, the date

last insured.  (Tr. 21)

## V.    Law and Analysis

### A.    Standard of Review and Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the

existence of a disability.  "Disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy2....

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to

follow the five-step sequential analysis set out in agency regulations, which can be paraphrased

as follows:

> 1. If the claimant is doing substantial gainful activity, she is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before she can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's RFC and use it to determine if claimant's impairment prevents her from doing past relevant work. If claimant's impairment does not prevent her from doing his past relevant work, she is not disabled.
>
> 5. If claimant is unable to perform past relevant work, she is not disabled if, based on her vocational factors and RFC, she is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987). Under this

sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v.*

*Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner

---

2 "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

at Step Five to produce evidence that establishes whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999); *Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

The court must also determine whether proper legal standards were applied, because, if not, reversal is required, unless the error of law was harmless. *See, e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th

Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [when] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

### B. Treating Source Rule

Spoor Park argues that the ALJ failed to give appropriate weight to opinions of treating physician, Dr. Mahna. *See* ECF Doc. 14, Page ID# 1099, 1101. Spoor Park argues that the ALJ gave no consideration to the length of the treating relationship between Spoor Park and her treating physicians, the frequency of examination, the supportability of the opinions, or the specialization of the treating source. ECF Doc. 14, Page ID# 1100 (citing *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004)). At times Spoor Park appears to base her arguments on multiple treating physicians' opinions. *See e.g.,* ECF Doc. 14, at Page ID# 1100 ("In completely rejecting Ms. Park's treating physicians' opinions . . . .") However, because Spoor Park only specifically mentions Dr. Mahna's opinions, the court's analysis will focus on Dr. Mahna's opinions in his work ability reports in Exhibit No. 13F (Tr. 882-910). *Id*. at 1099,

1101.  The commissioner counters that the ALJ properly assessed the opinion.  *See* ECF Doc. 15, Page ID# 1122.

The treating physician rule requires that "[a]n ALJ [] give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record."  *Wilson*, 378 F.3d at 544 (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).  If an ALJ does not give the treating source opinion controlling weight, the ALJ must use several factors to determine the weight to give the opinion, including: the length, frequency, nature, and extent of the treatment relationship; supportability; consistency; specialization; and other factors which support or contradict the opinion.  20 C.F.R. § 416.927(c).  The ALJ is not required to explain how he considered each of these factors but must provide "good reasons" for discounting a treating physician's opinion.  20 C.F.R. § 416.927(c)(2); *see also Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011).

Dr. Mahna issued two work ability reports, dated October 15, 2009 and December 4, 2009, before the December 31, 2009 date last insured.  (Tr. 883-84)  Both reports stated that Spoor Park was "totally disabled from work" from September 18, 2009 to March 18, 2010, and he listed the following ICD-9 codes for the allowed conditions being treated that prevented Spoor Park's return to work: 722.10, 847.2, and 296.20.  (Tr. 883-84)  Dr. Mahna issued his many other work ability reports after the relevant time period, from March 9, 2010 to October 23, 2012.  (Tr. 885-910)  The Sixth Circuit has explained that "evidence of disability obtained after the expiration of insured status is generally of little probative value."  *Strong v. Soc. Sec. Admin.*, 88 Fed. App'x 841, 845 (6th Cir. 2004).  Spoor Park does not argue that Dr. Mahna's opinions issued after the relevant time period relate back to before the date last insured.  *See Wirth v. Comm'r of Soc. Sec.*, 87 Fed. App'x. 478, 480 (6th Cir. 2003) ("Post-expiration

evidence must relate back to the claimant's condition prior to the expiration of her date last insured" to be relevant to the disability decision). However, the present situation is still very different from the case the commissioner cites, *Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 440 (6th Cir. 2017) in which the treating physician rendered a conclusory opinion more than seven years after the relevant period.

The ALJ did not discuss Dr. Mahna's work ability reports at all. The ALJ noted that Dr. Mahna examined Spoor Park on October 23, 2009 and December 4, 2009 and discussed Dr. Mahna's treatment notes from those dates. (Tr. 19) The ALJ also briefly mentioned a functional capacity evaluation Dr. Joseph Marino performed at Dr. Mahna's request, stating:

> The undersigned accords limited weight to the functional capacity evaluation performed by Saush [*sic*] Mahna, M.D., and evaluated by Joseph Marino, M. D., at Exhibit 9F. The evaluation was conducted on February 10, 2010, after the claimant's date last insured. The evaluation demonstrated that the claimant could not return to her past job as a nurse, however she could function at the light to medium physical demand level with vocational rehabilitation (exh. 9F p.7).

(Tr. 19) However, the ALJ neither discussed Dr. Mahna's work ability reports nor cited any portion of Exhibit 13F. This is not a situation in which the ALJ's discussion of other opinions, or of Spoor Park's medical history, makes clear the basis on which she rejected Dr. Mahna's opinion. *See Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 552 (6th Cir. 2010).

The commissioner argues that Dr. Mahna's work ability reports are not "medical opinions" because the reports only contain a statement on whether or not Spoor Park was disabled, an issue which is reserved to the commissioner. ECF Doc. 15, Page ID# 1123. I agree. "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairments(s) . . . ." 20 C.F.R. § 404.1527; *see also Andres v. Comm'r of Soc. Sec.*, No. 17-4070, 2018 WL 2017281, at *2 (6th Cir. Apr. 30, 2018). Determinations on the ultimate question of disability are reserved to the commissioner. 20 C.F.R. § 404.1527(d)(1); *see also Andres*, No. 17-4070, 2018 WL 2017281, at *5-6. An ALJ

will not give any special significance to the source of an opinion on issues reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(d)(3). Dr. Mahna's work ability reports only include a marked "check box" indicating that Spoor Park is "totally disabled from work" and are not medical source opinions. (Tr. 883-908) Controlling weight cannot be given to such opinions. *Dutkiewicz v. Comm'r of Soc. Sec.*, 663 F. App'x 430, 432 (6th Cir. 2016) *cert. denied sub nom. Dutkiewicz v. Berryhill*, 137 S. Ct. 1365, 197 L. Ed. 2d 521 (2017).

However, "even [when] controlling weight will not be accorded because a treating source's opinion relates to an issue reserved to the Commissioner, an ALJ still must explain the consideration given to the treating source's opinion(s)." *Id.* (Internal quotation marks omitted); *see also Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x 498, 505 (6th Cir. 2013). Here the ALJ failed to indicate whether she considered Dr. Mahna's work ability reports at all. This was legal error.

The commissioner argues that the ALJ's failure to address Dr. Mahna's work ability reports was harmless error because Dr. Mahna's work ability reports were patently deficient. *See* ECF Doc. 15, Page ID# 1123 (citing *Watters*, 530 F. App'x at 423). I disagree. The ALJ's failure to explain the consideration and weight given to Dr. Mahna's work ability reports does not fall into any of the exceptions recognized in *Wilson* (*see* 378 F.3d at 547) and Dr. Mahna's work ability reports are not patently deficient. Each of those reports lists diagnosis codes reflecting the physician's judgment concerning the nature of Spoor Park's impairments, and Mahna's comment that his patient was totally disabled from work reflected his judgment concerning the severity of the impairments, albeit using language that is not a "medical opinion."

Moreover, Dr. Mahna's treatment notes are consistent with his work ability reports. Dr. Mahna consistently found tenderness and mild spasm upon palpation in Spoor Park's lumbar paravertebral muscles, reduced lumbar spine range of motion, weakness in her left lower

extremity, and/or hypesthesia in the left L4-5-S1 dermatomes.  (Tr. 294, 310, 312, 314, 321, 339, 341, 344, 346, 351, 353, 383, 405-11, 415, 419, 460, 423, 426, 438, 443-45, 449, 503, 505, 507, 510, 528, 530, 533, 535, 537, 540, 542, 566)  Although Dr. Mahna initially recommended Spoor Park take the over the counter medications ibuprofen and naproxen (Tr. 423, 426, 438, 443, 449, 527, 529, 532, 534, 539, 541, 543-45, 566), he later recommended Lyrica, Ultram-ER, Skelaxin, Flexeril, and Vicodin to treat Spoor Park's pain and symptoms.  (Tr. 294-95, 310-15, 317, 319, 321, 338, 340, 343, 422-43, 425-26, 503)  Dr. Mahna's recommendations that Spoor Park consider pain management, a repeat high resolution MRI, and lumbar spine x-rays and undergo physical therapy also support a finding that his work ability reports are not patently deficient. (Tr. 322, 447, 449, 503, 566)  Also, at least some of the objective medical evidence is consistent with Dr. Mahna's opinions, including the MRI from 2009 that revealed a herniated disc at L5-S1 going into the foramen on Spoor Park's left side and triggered the microdiscectomy Dr. Itani performed on June 15, 2009.  (Tr. 337, 497)

Where, as here, a treating physician's opinion is consistent with the objective medical evidence, the opinion is not patently deficient.  *Blakley v. Comm'r Of Soc. Sec.*, 581 F.3d 399, 409-10 (6th Cir. 2009); *see also Shields v. Comm'r of Soc. Sec.*, No. 17-6091, 2018 WL 2193136, at *10 (6th Cir. May 14, 2018) (finding a treating source's opinion was not patently deficient because the record contained objective findings that were, at the very least, not inconsistent with source's assessment); *Morabito v. Berryhill*, No. 1:16CV2414, 2017 WL 3503397, at *16 (N.D. Ohio July 24, 2017), *adopted by sub nom. Morabito v. Comm'r of Soc. Sec. Admin.*, No. 1:16-CV-2414, 2017 WL 3494336 (N.D. Ohio Aug. 15, 2017).  Dr. Mahna also treated Spoor Park for over two years during the relevant time period.  *See Hall v. Comm'r of Soc. Sec.*, 148 F. App'x 456, 462 (6th Cir. 2005) (finding a treating physician's opinion was not patently deficient, in part, due to the many years of evaluation.).

The commissioner argues the reports were patently deficient because they only addressed the ultimate issue of disability. *Id*. at 1124. However, as discussed above, the Sixth Circuit has held that an ALJ must explain the consideration given to a treating source's opinions even though the opinion relates to an issue reserved to the commissioner. *See Dutkiewicz*, 663 F. App'x at 432; *see also Johnson*, 535 F. App'x at 505.

The commissioner argues the work ability reports are patently deficient because they only refer to her ability to return to work as a licensed practical nurse. *See* ECF Doc. 15, Page ID# 1124. The commissioner may be right that Dr. Mahna intended his work ability reports to only refer to Spoor Park's ability to work as an LPN. But, the court cannot say, based on a review of the administrative record, that no other conclusion is possible. Further, the commissioner provides no legal support for this argument; and, pursuant to 20 C.F.R. § 404.1565, a claimant's work experience is a vocational factor.

The commissioner also argues that Dr. Mahna's statement fell at the end of Spoor Park's relevant time period, stated she would only be disabled for two months, and failed to show that she would have been disabled for at least 12 months. *See* ECF Doc. 15, Page ID# 1124 (citing 20 C.F.R. § 404.1509). Actually, the October 15, 2009 and December 4, 2009 reports stated Spoor Park was "totally disabled from work" for two, three-month periods, that spanned September 18, 2009 to March 18, 2010. (Tr. 883-83) Dr. Mahna also indicated that Spoor Park was unable to work due to work-related injuries or diseases corresponding to ICD-9, or medical billing, codes 722.10, 722.83, 847.2, which are consistent with some of the diagnoses in Dr. Mahna's treatment records from April 20, 2007 through the end of the relevant period, namely lumbar sprain and L5-S1 disc herniation. (Tr. 346, 351, 353, 383, 405, 407, 409, 411, 419, 423, 426, 438, 443, 447, 460, 528, 530, 533, 535, 537, 540, 542, 566, 883-908) Dr. Mahna's

treatment records consistently indicated Spoor Park should "remain[] off work" during the relevant period. *See e.g.* Tr. 426

The commissioner relies on *Marvin v. Comm'r of Soc. Sec.*, No. 3:11-cv-2170, 2013 WL 518721 (N.D. Ohio Feb. 12, 2013). In that case, the claimant's treating physician wrote a note on a prescription pad, in which the physician listed some ailments and opined that the claimant was "unemployable." *Marvin*, No. 3:11 CV 2170, 2013 WL 518721, at *2-3. In *Marvin*, the ALJ's decision made no mention whatsoever of the treating physician's opinion. *Id*. at *3. The same is true here. *Marvin* noted that the ALJ was required to evaluate the evidence rather than ignore it, but found that the ALJ's failure to address the opinion was harmless error because the commissioner had met the goal of § 1527(d)(2) even though the ALJ had not complied with the terms of the regulation. *Id*. at *3-4. The court found the ALJ indirectly attacked the treating source's opinion with contradictory evidence in the record because the ALJ "provided a detailed discussion of objective medical evidence, functional capacity findings, and Plaintiff's credibility." *Id*. at *4. The same conclusion cannot be reached here. The ALJ gave scant consideration to the medical evidence, devoting a single paragraph to the analysis of Dr. Mahna's two years' worth of treatment records. And the commissioner has not even attempted to argue that other parts of the ALJ's decision indirectly attacked Dr. Mahna's work ability reports.

This decisional dilemma the court faces here arises because of skimpy ALJ work product and equally skimpy work ability reports of Dr. Mahna. Had the ALJ written only a paragraph or two more concerning Dr. Mahna's records and work ability reports, there likely would have been a sufficient basis for her to have rejected Dr. Mahna's vacuous work ability reports. Instead, the ALJ simply ignored the work ability reports. According to the Sixth Circuit's statement in *Dutkiewicz*, 663 F. App'x at 432, that was error. And, it was not harmless error; this court and

the claimant are forced to guess why the ALJ rejected those opinions – or whether she considered them at all.  Even if the ALJ had a proper basis for rejecting them – and the court's own review of the record suggests she might have – ALJ decisions requiring reviewing court guesswork court cannot be affirmed.

This matter will be remanded to afford the ALJ the opportunity to sufficiently evaluate and explain the consideration given to Dr. Mahna's opinions.

### C.       Determination that Depression was not A Severe Impairment

Spoor Park also argues that the ALJ erred in failing to include depression as a severe medically determinable impairment.  ECF Doc. 14, Page ID# 1102.  The commissioner counters that the ALJ properly determined that Spoor Park's depression did not significantly limit her ability to perform basic work.  ECF Doc. 15, Page ID# 1120.

A severe impairment is one that significantly limits a claimant's physical or mental ability to do basic work activities.  *See* 20 C.F.R. §§ 1520(c); 920(c).  "Basic work activities" are "the abilities and aptitudes necessary to do most jobs," including: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting.  20 C.F.R. §§ 1522(b); 922(b).  Spoor Park bears the burden of demonstrating that she suffers from severe impairments.  *Preslar v. Sec'y of Health & Human Servs*., 14 F.3d 1107, 1110 (6th Cir. 1994) (claimant bears burden during first four steps).

Spoor Park argues that the ALJ's failure to include depression as a severe medically determinable impairment cannot be reconciled with the record.  ECF Doc. 14, Page ID# 1102.  In her discussion of the facts, Spoor Park argues that "[i]n a psychological evaluation after her

injury, she reported limitations on her activities of daily living, inability to shower or get out of bed in the morning, poor concentration and libido, irritability, withdrawal in social situations, and change in appetite." *Id.* at 1098. However in making this argument, she actually cited to a daily treatment note from a physical therapist that does not support her assertion. *Id.* (citing Tr. 297). She also does not challenge the ALJ's finding that objective medical evidence or other evidence of record did not substantiate her subjective statements about the intensity, persistence, or functionally limiting effects of her symptoms. (Tr. 18, 20)

Spoor Park also argues that she was diagnosed with major depressive disorder and again cites to the same physical therapy treatment note. ECF Doc. 14, Page ID# 1098 (citing Tr. 297). Although at least one medical provider found Spoor Park's symptoms were consistent with depression (Tr. 17, 293), Spoor Park has not presented any evidence showing that her alleged depression resulted in specific functional limitations. Her diagnosis itself says nothing about the severity or impact on her ability to perform basic work activities. *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988); *Kennedy v. Astrue*, 247 Fed. App'x 761, 767 (6th Cir. 2007).

The ALJ's exclusion of depression from Spoor Park's list of severe impairments was supported by substantial evidence. (Tr. 16-17) The ALJ noted that during Spoor Park's evaluation with Dr. Jay Weinstein, she reported she was able to leave her home to shop, eat at a restaurant, and attend to her daughter. (Tr. 16, 292) The ALJ noted that Dr. Weinstein observed Spoor Park "to be alert and oriented with no symptoms of cognitive dysfunction." (Tr. 16, 293) The ALJ noted that Spoor Park received "sporadic therapy" in 2006 and 2007 (Tr. 16, 756) and rejected treatment of her depression with medication. (Tr. 16, 748-49, 835) The ALJ found that Spoor Park had mild limitation in activities of daily living because she was able to care for her young daughter and perform housework. (Tr. 16, 759) He found Spoor Park had mild limitations in social functioning because she was able to attend numerous appointments with

medical professionals, interact with her husband, teenage daughter, and young child, had no deficits in communication, could leave home when needed, and there was no evidence that suggested a lack of insight or judgement or thoughts of harm toward others.  (Tr. 16-17, 759)  The ALJ found Spoor Park had mild limitation in concentration, persistence, or pace because she was able to be responsible for her young child, could drive independently, follow her prescribed treatment, and sustain concentration and persistence in evaluations.  (Tr. 17)  The ALJ found Spoor Park had experienced no episodes of decompensation that had been of extended duration. *Id*.

Spoor Park argues that because the ALJ found she had mild limitations in the "paragraph B" criteria functional areas, depression should have been included as a severe impairment because "[b]y definition, mild is more than minimal."  ECF Doc. 14, Page ID# 1102.  Courts in this Circuit have rejected similar arguments.  *See, e.g., Dominey v. Comm'r of Soc. Sec.*, No. 2:16-CV-1004, 2017 WL 5991758, at *5 (S.D. Ohio Dec. 4, 2017), *adopted by*, No. 2:16-CV-1004, 2018 WL 1324953 (S.D. Ohio Mar. 13, 2018).  In *Dominey*, the court analyzed the issue as follows:

> [A]n ALJ's determination that a claimant has some mild impairment does not *require* inclusion of mental limitations into the RFC.  *See, e.g., Little v. Comm'r of Soc. Sec.*, No. 2:14-cv-532, 2015 WL 5000253, at *13-14 (S.D. Ohio Aug. 24, 2015) (no error where ALJ did not include RFC limitations to address findings of mild mental limitations); *Walker v. Astrue*, No. 3:11-cv-142, 2012 WL 3187862, at *4-5 (S.D. Ohio Aug. 3, 2012) (finding that substantial evidence supported the ALJ's determination that the claimant's mental impairments were mild enough not to warrant specific RFC limitations); *see also* 20 C.F.R. § 404.1520a(d)(1) ("If we rate the degrees of your limitation as 'none' or 'mild,' we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities...."). An ALJ need only include limitations arising from an impairment, severe or non-severe, [when] the impairment affects a claimant's capacity to work.  *See Griffeth v. Comm'r*, 217 Fed.App'x 425, 426 (6th Cir. 2007) ("The RFC describes the claimant's residual abilities or what a claimant can do, not what maladies a claimant suffers from – though the maladies will certainly inform the ALJ's conclusion about the claimant's abilities.  A claimant's severe impairment may or may not affect his or her functional capacity to do

work. One does not necessarily establish the other." (Internal quotation marks and citations omitted)).

2017 WL 5991758, at *5. Here, the ALJ rated the degree of Spoor Park's limitations in each of the "paragraph B" functional areas as "mild" and found that her impairment was not severe, which is consistent with the Social Security regulations. *See* 20 C.F.R. § 404.1520(d)(1). Spoor Park has not pointed to any evidence proving there was more than a minimal limitation in her mental ability to do any gainful activity.

The court finds substantial evidence supported the ALJ's determination that Spoor Park's alleged depression was not a severe impairment within the meaning of the social security regulations.

## VI.    Conclusion

The court finds the Commissioner's failure to address the work ability reports of Spoor Park's treating physician, Dr. Mahna, was non-harmless legal error requiring remand. However, the Commissioner's Step Two determination that Spoor Park's depression was not a severe impairment was supported by substantial evidence. The final decision of the Commissioner is VACATED and the case is REMANDED, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Memorandum of Opinion and Order.

**IT IS SO ORDERED.**

Dated: June 22, 2018

Thomas M. Parker
United States Magistrate Judge